UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

ROSEANN PAYNE,

                                                                                               14 CV 7098 (ALC)

                              Plaintiff,

          -against-

IMANI KIRKLAND,

                              Defendant.
------------------------------------------------------------x

**DECLARATION OF BRETT H. KLEIN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

    **BRETT H. KLEIN** declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I am a founding partner of Brett H. Klein, Esq., PLLC ("Klein Civil Rights" or "KCR"), and lead counsel for Plaintiff ROSEANN PAYNE in this matter. I make this declaration in support of an application for attorneys' fees and costs pursuant Rule 54 given the Judgment entered in Ms. Payne's favor on March 3, 2017, covering the hours and costs that Lissa Green-Stark, Esq. and myself expended and accrued in prosecuting this action on behalf of Ms. Payne. I am familiar with the facts discussed herein and attach as exhibits true and correct copies of the documents mentioned herein.

    2.    All attorneys and paralegals at KCR maintain contemporaneous time records reflecting the time spent on this and other matters. Timekeepers at KCR type their time directly into a computer program. The timekeeper indicates the date and amount of time spent on a task, describes the work that was performed during the specified time period, and identifies the case to which the time should be charged. Pursuant KCR's system, the billing discretion I exercised,

and deductions I have made as described below in paragraph 69, attached as Exhibit 1, is a full and correct copy of those time entries relating to the work conducted on behalf of Ms. Payne in this action.

## KCR'S INVOLVEMENT IN THE MATTER

3.      I have been lead counsel on this case since Ms. Payne first contacted my prior law firm, Leventhal & Klein, LLP, to inquire about prosecuting a civil rights action against defendant New York State Trooper Imani Kirkland.

4.      Ms. Payne asserted and won at trial an excessive force claim against defendant Kirkland arising from an incident which occurred on September 17, 2011, at approximately 10:00 a.m., on the Taconic State Parkway, during a traffic stop initiated by defendant Kirkland in his capacity as a law enforcement officer.  As set forth in the complaint, at the time of the stop, Ms. Payne had been driving northbound on the Taconic when defendant Kirkland pulled her vehicle over in the vicinity of the Mt. Kisco exit, in the Town of New Castle, New York.  Ms. Payne observed defendant Kirkland's vehicle on the right-hand side of the road engaged in a traffic stop of another vehicle.  Ms. Payne slowed down as she passed.  Defendant Kirkland thereafter pulled out and initiated a stop of Ms. Payne's vehicle apparently because Ms. Payne did not switch to the left lane when she passed his vehicle.  Upon running Ms. Payne's license, defendant Kirkland informed Ms. Payne that her license was suspended and that the registration of the vehicle she was driving was also suspended.  Ms. Payne was not aware of any issues with her license or with the registration of the vehicle, which belonged to her daughter, prior to the stop.  Kirkland further informed Ms. Payne that she could not continue to drive her vehicle; that he would call for a tow truck, and that Ms. Payne could call someone to pick her up.  Ms. Payne called her daughter and arranged for her to pick her up at the scene.

After waiting approximately twenty or more minutes, during which time plaintiff walked her dog and otherwise remained calmly on the scene of the stop, plaintiff was seated in the front passenger side seat of her vehicle when the tow truck arrived at the location. Defendant Kirkland exited his vehicle and informed Ms. Payne that she would have to get out of her vehicle. Situated on the side of a busy parkway with her small dog with her, Ms. Payne calmly and politely asked, in sum and substance, if she could remain in her vehicle until her daughter arrived, as she expected her daughter would be there soon. Defendant Kirkland responded, in sum and substance, that Ms. Payne had to exit her vehicle. Ms. Payne calmly and politely began to respond, in sum and substance, my daughter is on the way, can I please . . . . Before completing her sentence, defendant Kirkland, grabbed Ms. Payne's right arm without warning, pulled Ms. Payne out of her vehicle, physically spun Ms. Payne around, and intentionally, unnecessarily and otherwise unreasonably tripped her with his leg, causing her to fall to the ground on her right knee. Defendant Kirkland handcuffed Ms. Payne and imprisoned her in his vehicle. Notably, Ms. Payne's daughter arrived while defendant Kirkland and Ms. Payne were still at the scene.

As a result of defendant Kirkland's use of excessive force, Ms. Payne sustained physical injuries and emotional distress. Ms. Payne first sought medical treatment on September 18, 2011 at Barnabas Health Community Medical Center, reporting that she had sustained an injury to her right knee after being pulled out of a car by a state trooper. She presented with pain and tenderness of her right knee over the patella with some effusion. Continuing to experience pain and discomfort, Ms. Payne thereafter followed-up with Ocean Orthopedic Associates, PA on October 3, 2011, where she presented with pain and medial joint line tenderness and was administered a Depo-Medrol injection into her right knee. Ms. Payne was administered a MRI

on October 10, 2011, which revealed that she had sustained areas of bone bruise with osteochondral fracture of the lateral femoral condyle, a torn medial collateral ligament at the superior attachment, and a torn posterior cruciate ligament around the superior attachment. Ms. Payne was then prescribed a Bledsoe brace, which she was to wear for eight weeks, and was informed she may need surgery. Ms. Payne was examined several weeks before trial by retained knee specialist Robert J. Meislin, MD, of the NYU Langone Medical Center, who concluded after an exam and a follow-up MRI that Ms. Payne's injuries arising from the incident were causally related to the incident, permeant in nature, and may require surgery, including right knee arthroscopy, and possible osteochondral biologic resurfacing.

5. Over the course of investigating and preparing Ms. Payne's case from inception through trial, Ms. Payne and I have developed a close working relationship.

6. Prior to drafting the complaint, my prior firm fully investigated Ms. Payne's claims. In addition to meeting with Ms. Payne and communicating with her as her physical and emotional injuries remained ongoing and progressive in nature, we pursued, gathered, and reviewed her medical records, and made and pursued a FOIL request for court records arising from the incident.

7. Thereafter, we researched Ms. Payne's claims, and drafted the original Complaint.

8. That initial complaint was filed on September 3, 2014. (Dkt. No. 1.)

### *Serving Kirkland*

9. From the outset of the litigation, plaintiff encountered difficulties in what ostensibly should have been non-complex tasks involving one defendant. After a number of unsuccessful attempts to serve the defendant, I was able to obtain the assistance of an Assistant Attorney General ("AAG") in the Attorney General's Litigation Division. (ECF Doc. 3). When

this AAG required additional time to verify Kirkland's address, we had to ask the Court for an extension of time to complete service. *Id.* I was thereafter referred to an Assistant Counsel in the NYS Division of Police legal division to obtain defendant Kirkland's service address. Once we obtained the address, our process servers were able to complete service. (ECF Doc. 5.)

### *Motion to Dismiss and Amended Complaint*

10. Defendant sought and was granted an extension of time to respond to the complaint. (ECF Docs. 6 and 8.)

11. In lieu of answering, defendant filed a motion to dismiss. (ECF Doc. 10.)

12. Plaintiff filed an amended complaint as of right on March 30, 2015. (ECF Doc. 12), together with a letter setting forth plaintiff's position that defendant's motion was moot. (ECF Doc. 13.)

13. An initial conference was held on April 8, 2015, resulting in the issuance of a Scheduling Order. (ECF Doc. 16.)

14. Defendant finally answered the amended complaint on April 17, 2015. (ECF Doc. 17).

### *Discovery*

15. Discovery was initially scheduled to close by October 30, 2015, with a final pretrial conference scheduled for September 16, 2015.

16. Plaintiff had served her first set of interrogatories and document requests on April 8, 2015.

17. Defendant served his discovery responses in mid-June 2015.

18. Because defendant's responses were insufficient, plaintiff followed up with a deficiency letter to defense counsel in July.

19. Given the discovery deadline, plaintiff deposed defendant Kirkland on August 25, 2015, despite not having all necessary documents.

20. Defendant thereafter made supplemental disclosures starting in October 2015.

21. Plaintiff prepared and served responses to defendant's demands in June-July 2015 without objection.

22. Plaintiff was deposed by the defendant on August 31, 2015.

23. Ms. Payne's daughter was deposed by the defendant on November 23, 2015.

24. As discussed more fully below, on the last day of discovery, November 30, 2015, defendants disclosed new witnesses and/or an address for a witness. One of the witnesses was deposed on the morning of one of the trial dates.

*Expert Discovery*

25. Given the apparent permanency of Ms. Payne's injuries, Ms. Payne was evaluated and referred for an updated MRI by Robert Meislin, M.D., a retained orthopedic expert that was recommended to me by a friend who is in the medical profession and holds Dr. Meislin in high regard.

26. Dr. Meislin confirmed that Ms. Payne's continued symptoms were causally related to the incident, and likely permanent.

27. We obtained and served Dr. Meislin's report and the updated MRI, and prepared and served plaintiff's expert disclosure on October 30, 2015.

28. While plaintiff appeared for a defense examination, no expert report or disclosure was served by the defense.

*Pre-trial Motion Practice and Filings*

29. On October 22, 2015, defendant again sought permission to file a motion, this

time for summary judgment (ECF Doc. 31.)  Of note, defendant relied on his version of the facts in his letter, and not plaintiff's, notwithstanding the well settled standard for summary judgment motions.

30.     By letter dated October 29, 2015, we pointed this fatal flaw out to the Court, and asked that the request to move be denied as futile.  (ECF Doc. 35.)

31.     At a pre-motion conference held on November 2, 2015, an expedited briefing schedule was set, the Court directed that all outstanding discovery be completed by November 30, 2015, and it set deadlines for pre-trial filings and a trial date of December 14, 2015 was fixed.  (ECF Doc. 36.)

32.     The deadline for the motion filing came and went, with defendant apparently conceding that the proposed motion would have been futile as they filed no such motion.

33.     On November 30, 2015, the last day of discovery, after the close of business at 6:48 p.m., and only fourteen days before trial, defendant Kirkland served Supplemental Rule 26(a) disclosures identifying four additional witnesses per Rule 26 for the first time: Zone Sergeant Hamilton, Captain Brendan Casey, Lieutenant Douglas A. Larkin, and a Sergeant "to be identified", and providing a new address for a non-party who could not previously be located, William Bender.  Plaintiff immediately raised her concerns to defendant that the witnesses/information were disclosed too late for defendant to rely on said witnesses, and that she intended to raise this issue with the Court.  Having not reached an agreement regarding these late disclosed witnesses, on December 3, 2015, plaintiff served defendant with a Motion *in Limine* moving to preclude (among other evidence or testimony) all of the newly identified witnesses.

34.     I thereafter met and conferred with defense counsel, who agreed to not call new

7

witnesses Casey, Larkin, and the Sergeant "to be identified," but refused to withdraw Bender and Hamilton as witnesses.

35. By letter dated December 7, 2015, plaintiff sought expedited relief to preclude these witnesses, given the imminent trial date. (ECF Doc. 49.)

36. After receiving defendant's opposition (ECF Doc. 51), plaintiff submitted a reply. (ECF Doc. 55.)

37. Plaintiff also filed her motion in limine. (ECF Docs. 57-59.)

38. A telephonic hearing was held on December 10, 2015, at which time the Court allowed Bender to testify so long as he was produced to be deposed by plaintiff at defendants' expense prior to trial, together with other rulings on the parties' respective in limine motions.

39. With only days to trial, plaintiff was available to depose Bender by the end of the week before trial. Because defense counsel was conducting a scene visit for this case, she was "unavailable", and requested that we depose Bender on the Sunday before trial.

40. On December 12, 2015, plaintiff renewed her motion to preclude Bender under the circumstances. (ECF Doc. 68.)

41. Judge Scheindlin allowed the witness to be produced prior to trial for a deposition in her courtroom on December 15, 2015, before the trial started for that day, but at defendant's expense.

42. Ms. Green-Stark, assisted by the undersigned, conducted the deposition.

43. After causing plaintiff to spend substantial time dealing with the late disclosure, and then preparing for and conducting this deposition during valuable trial preparation time in the courtroom on a trial date, defendant chose *not* to call Bender at trial even though he was present in court and able to testify that day at trial.

44. Prior to trial, my office also prepared a joint pre-trial order, and drafted and submitted requests to charge and proposed voir dire. (ECF Docs. 42-44.)

45. We also drafted and filed objections to defendant's proposed jury instructions and verdict sheet. (ECF Doc. 76.)

46. Finally, we spent many hours preparing our client, her daughter and Dr. Meislin for their direct testimonies, and preparing for the cross examination of defendant Kirkland.

*The Trial*

47. Jury selection took place on December 14, 2015, followed by opening statements of counsel.

48. After about two days of testimony from the plaintiff, her daughter, defendant Kirkland, and plaintiff's medical expert, Dr. Meislin, followed by closing arguments and a charging conference on December 16, 2015, the jury began its deliberations.

49. Working after 5 p.m. into the early evening on December 17, 2015, the jury returned a verdict in Ms. Payne's favor in the amount of $7,500.

50. It is my understanding that defendant intends to pay the judgment, and that the only outstanding dispute remaining in this case is not plaintiff's entitlement to fees, as such is well settled, but rather the amount of fees and costs to be awarded to Ms. Payne.

*Settlement False Starts*

51. At the initial conference, Judge Scheindlin referred the case to Magistrate Judge Gorenstein for settlement purposes.

52. Magistrate Judge Gorenstein issued a settlement conference order on June 23, 2015, with various pre-conference requirements, and scheduling a first settlement conference for July 31, 2015.

53. My office prepared plaintiff's confidential ex-parte settlement letter.

54. On July 24, 2015, defense counsel asked to cancel the conference given her lack of authority.

55. Despite extensive discussions between the undersigned and AAG Maria Hartofilis, a supervisor in the AG's Office in early December 2015, no authority was eventually obtained or offered at that time.

56. At Judge Scheindlin's referral, another settlement conference before Magistrate Judge Gorenstein was set for December 1, 2015 via Magistrate Judge Gorenstein's order dated November 13, 2015. (ECF Doc. 38.)

57. Plaintiff again drafted her confidential ex-parte settlement submission to the Court.

58. On November 23, 2015, defense counsel requested an adjournment of the conference. (ECF Doc. 39.) The conference was adjourned to December 9, 2015. (ECF Doc. 40.)

59. On December 8, 2015, defendant informed Magistrate Judge Gorenstein that he wanted to cancel the conference as he had no authority to engage in meaningful discussions. The conference was canceled.

60. On May 3, 2016, for settlement purposes only, plaintiff served an interim streamlined report of her fees and costs to defendant, at defense counsel's request, in another effort to try to resolve this case without necessitating this fees motion.

61. As reported to the Court in successive extension requests, it took defense counsel until late December 2016 to obtain authority. (ECF Docs. 80, 84, 88, 90, and 94.) Finally, early last month, Ms. Hartofilis acknowledged that this motion would have to be filed, as settlement

was not likely.

62. Plaintiff prepared and filed a consent judgment, which was entered on March 3, 2017. (ECF Doc. 96.)

63. The instant motion is timely pursuant to Rule 54.

64. Given this record, Defendant cannot now claim that the time spent litigating the case was without basis or that the hours expended are anything but reasonable.

**I.     Plaintiff's Fees Accrued in this Action are Reasonable**

65. As the partner in charge of this matter, I oversaw the work of Ms. Green-Stark and my respective firms' paralegals, as well as the work of other firm personnel and an orthopedic expert to appropriately and capably investigate the claims, and to litigate the case through discovery, trial, and this post-trial briefing.

66. In accordance with KCR's practices of utilizing the least expensive level of personnel where appropriate and consistent with the highest professional standards, KCR (and previously LK) utilized our associate, Ms. Green-Stark, for a substantial amount of the work done in this case.

67. The core legal team consisted of Ms. Green-Stark and myself, and indeed our hours account for almost 98% of the total attorney hours expended on the matter. A summary of the hours expended is provided for convenience here:

| Lawyer | Title/Law School Year | Hours | Rate |
|---|---|---|---|
| Brett Harris Klein | Partner, 1997 | 177.56 | $575.00 |
| Lissa Green-Stark | Associate, 2008 | 141.76 | $350.00 |

**Total Attorney Hours:** 319.32   **Total Fees:** $151,713.00

68.     Because of the significant number of hours expended on this matter, Ms. Green-Stark and I were unable during the intense periods of litigating this case to take on other matters and/or to deal with other pressing litigation issues.

69.     In my billing discretion, I removed from the invoice all time contributed to litigating this case by my former partner, Jason Leventhal, which amounted to $3,225 in fees, and by LK and KCR paralegals, which amounted to $537.50 in fees.

70.     I have reviewed our time records and the expense records, and certify that these records reflect work reasonably and necessarily performed, and expenses reasonably and necessarily incurred in connection with the litigation of this matter.

**II.     The Costs Accrued Are Reasonable as Well**

71.     Regarding costs, KCR has incurred $10,487.79 in costs. Attached as Exhibit 2 is a detailed listing of the costs accrued in this matter through March 16, 2017. The costs are of the type normally charged to clients of KCR. The costs and expenses identified in Exhibit 2 are reflected in the accounting books and records KCR maintains in the ordinary course of business. These books and records are prepared from bills from vendors, receipts and expense vouchers and check records. Copies of those individual records, showing full details of charges and expenses incurred in this action, are too voluminous to attach to this declaration. We will of course make them available to Defendants or the Court immediately upon request. The out-of-pocket costs incurred by KCR to prosecute this case were for customary litigation expenses like filing fees, process servers, retrieval of medical records, expert review of medical records, expert testimony, and court reporters.

72.     I also exercised my billing discretion in excising from the invoice approximately

$180 of costs incurred for meals and other miscellaneous expenses.

73. The following is a simplified chart of the actual costs for which KCR seeks reimbursement, based on the detailed list of costs that may be found at the back of Exhibit 2:

| Category | Amount | Category | Amount |
|---|---|---|---|
| Supplies | $33.74 | Parking/car fare | $67.53 |
| Process Server | $248.00 | Court Fees | $400.00 |
| Court Reporters | $1,315.80 | Fedex | $10.00 |
| Medical Records | $62.72 | Expert Review of Records and Testimony | $8,350 |

Total: $10,487.79

### III. KCR'S HOURLY RATES ARE REASONABLE

74. KCR is a two-lawyer firm located in downtown Manhattan that specializes in civil rights litigation in the federal and state courts. I have extensive experience litigating over several hundred civil rights cases for almost two decades, and KCR's associate, Lissa Green-Stark, has outstanding credentials and significant litigation experience. Our attorneys have all achieved a high degree of success in their cases and they enjoy excellent reputations in their field.

75. KCR attorneys have all dedicated the majority of their legal careers to handling cases that are at the forefront of battles against institutional abuse and in protection of constitutional rights. The detailed experience of the individual attorneys who worked on this case is set forth below.

### Brett H. Klein

76. I received my B.A. from Binghamton University in 1994, and my J.D. degree from Brooklyn Law School in 1997. Throughout my time at law school, I spent many hundreds of hours interning and/or working in the Kings County District Attorney's Office, for the City's

13

Corporation Counsel, and for a private criminal defense attorney. From September 1997 to July 1999, I served as an Assistant Corporation Counsel in the City Law Department's Family Court Division, which I was responsible for trying dozens of juvenile delinquency cases in Brooklyn.

77. I transferred in 1999 to the City's then recently created Special Federal Litigation Division, where I was quickly promoted to Senior Counsel. Although I was a young attorney at a large municipal law office, I was able to obtain significant federal trial experience through personally trying and/or supervising junior lawyers in federal jury trials in the Southern and Eastern Districts.

78. I was promoted to team leader at the City's Law Department, one of about six such team leaders who reported directly to the Special Federal Litigation Division's division chief. In that capacity, I was involved in hiring decisions, training lawyers and providing CLE courses, supervising the caseloads of approximately ten lawyers at a time from inception through trial, and maintaining my own caseload of high profile and/or complex individual and class action litigations in federal court.

79. I joined Leventhal & Klein, LLP ("LK") as a founding partner in February 2004. My work at LK included all aspects of investigating, instituting, managing, and litigating civil rights claims on behalf of victims of law enforcement misconduct. I have served as counsel on several hundred civil rights cases over the years, including without limitation a large number of excessive force and police and/or correction misconduct cases such as: *Remice v. Zenk,* 03 CV 286 (BMC) (E.D.N.Y.)(obtained substantial settlement for victim of rape by a federal prison guard at the MDC facility in Brooklyn), *Sayers v. City of New York,* 04 CV 3907 (CPS) (E.D.N.Y.)(negotiated a $400,000 settlement for paraplegic prisoner who was improperly secured in a City DOC van after the district court permitted plaintiff's *Monell* claim to be tried);

14

*Butler v. City of New York,* 11 CV 8993 (JSR)($975,000 settlement for man who was kicked in the eye by an NYPD Sergeant in the Bronx); *Mohammed v. City of New York,* 12 CV 1709 (ILG) (E.D.N.Y.)(obtained a $800,000 settlement for a man who was falsely arrested and sustained a fractured jaw by NYPD officers in Staten Island); *Graham v. City of New York*, 08 CV 3518 (MKB) (E.D.N.Y.) (represented an individual falsely arrested by two police officers in Brooklyn through trial, resulting in a $150,000 verdict for a 40 minute false arrest that was settled for the verdict amount plus fees after post-trial motions were decided in plaintiff's favor); *Rodriguez v. City of New York,* 12 CV 4039 (RJD) (E.D.N.Y.)($300,000 settlement for man whose elbow was broken by NYPD narcotics detectives in Brooklyn when an officer pulled his legs out from under him while he was handcuffed); *Ralph v. City of New York*, 14 CV 4668 (WFK) (E.D.N.Y.)($325,000 settlement for a man who was subjected to excessive force when NYPD officers pushed their knees in his back and slammed his face to the ground).

80. In July 2015, I dissolved LK and formed Brett H. Klein, Esq., PLLC, or Klein Civil Rights ("KCR"). Since founding KCR, I have continued to practice primarily in the area of police misconduct and civil rights. My cases have continued to focus above all on constitutional abuses or abuse of authority by those in power against those without. In addition to some of the cases listed above, since founding KCR, I have obtained substantial results for my clients, including: *Estate of Streeter v. City of New York,* 11 CV 2841 (VMS) (E.D.N.Y.)($1,500,000 settlement for the estate of a Staten Island man who died after being held in a face down position for 30 minutes by NYPD officers in Staten Island); *Evelyn v. City of New York*, Kings Supreme Court Index No. 16966/2008 ($1,000,000 settlement for school janitor wrongfully accused of sexual assault of a student leading to two days in custody); *Ortega v. City of New York*, 13 CV 6646 (FB) (E.D.N.Y.)($450,000 settlement for unlawful police entry and resulting arrests and

injuries to a family celebrating Labor Day at home in Staten Island). Among other significant pending matters, in *Thomas v. State of New York,* I represent Adrian Thomas, who was wrongfully convicted of murdering his infant son based on an unconstitutionally coerced confession, in a damages claim under New York's Unjust Conviction and Imprisonment Act. I also represent the Estate of Dainell Simmons, a developmentally disabled man who was asphyxiated by Suffolk County police officers who held him down in a prone position as they attempted to place leg restraints on him, in *Simmons v. County of Suffolk,* 14 CV 3884 (AMD) (E.D.N.Y.). And I represent Shane Rhooms, a man who was held on Rikers Island for weeks after being falsely accused of attempted murder of three police officers in Brooklyn when he was able to prove he was in Manhattan at the time of purported shooting. *Rhooms v. City of New York,* 11 CV 5910 (PKC) (E.D.N.Y.).

81. At LK -- and now at KCR -- I managed associates and paralegals, and substantially all other aspects of firm administration.

82. I am a member of NPAP -- the National Police Accountability Project, a project of the National Lawyers' Guild, and the Federal Bar Council, among other bar associations. I have for several years been an active member of the Eastern District's Committee on Civil Litigation, which I was invited to join by Magistrate Judge Steven M. Gold.

83. In 2014, I was invited by the Southern District's Mediation Program to provide a portion of a CLE offered for SDNY mediators, providing a perspective from the plaintiff's bar.

84. In short, I have been practicing since 1997 and have focused my practice on civil rights litigation. I have handled several hundred civil rights cases at all stages, from intake to initiation, through jury and bench trials and on appeal, in both state and federal courts. In the

16

past several years, I have led or co-led five jury or bench trials with four verdicts in my clients' favor.

85.     Based on the prevailing rates for attorneys practicing for more approximately twenty years with the requisite experience in employment discrimination cases, KCR seeks a rate of $575 per hour for my work.

86.     This rate is consistent with the rates awarded to civil rights litigators of comparable experience in Manhattan, where KCR is located.

### Lissa Green-Stark

87.     Lissa Green-Stark graduated from Oberlin College in 2002 and received her J.D. degree from Boston University School of Law in 2008, where she was an articles editor of the Boston University Public Interest Law Journal, an editor of the for the Boston University Legislative Drafting Clinic, and a secretary and then board member of the Public Interest Project. Ms. Green-Stark also interned with the United States Attorney's Office.

88.     After graduating from law school, Ms. Green-Stark worked for over two years at Batiste Aronowsky & Suchow, Staten Island Legal Defense Services ("BAS"), a firm that was charged with representing indigent criminal defendants in Staten Island.  During her time at BAS, Ms. Green-Stark represented clients accused of both felonies and misdemeanors in all aspects of their criminal cases, handling a case load of up to 100 or more clients at a time.  Ms. Green-Stark first chaired three misdemeanor bench trials, second chaired two felony trials, appeared at numerous hearings, filed numerous successful motions on behalf of her clients, and made all necessary court appearances for her clients during her time at BAS.

89.     In 2011, Ms. Green-Stark joined LK as an associate.  Ms. Green-Stark was involved in the prosecution of hundreds of civil rights cases at LK from inception through trial

through the firm's dissolution in July 2015.  During the majority of her time at LK, Ms. Green-Stark was the sole associate and was at all times the primary litigation associate.  Ms. Green-Stark conducted dozens of depositions each year, assisted in preparing nearly all litigation papers and motions, and second chaired a federal trial.

90.     Since joining KCR in July 2015, Ms. Green-Stark has continued to work on an intensive and challenging caseload of constitutional and civil rights cases as the sole associate at KCR.  Her work at KCR has ranged from client intake, to depositions, to drafting motion responses and Second Circuit briefs.  She has also second chaired two federal trials, including this trial, and prepared other federal cases to the eve of trial.  Having supervised Ms. Green-Stark since March 2011, I can state that Mr. Green-Stark has extensive knowledge, skill, and expertise in the areas of civil rights law and New York criminal law.

91.     Based on the prevailing rates for attorneys of Ms. Green-Stark's experience, KCR seeks a rate of $350 per hour for her work.

92.     This rate is consistent with the rates awarded to civil rights litigators of comparable experience in New York City, where KCR is located.

**CONCLUSION**

93.     In sum, KCR requests a total fee award of $151,713.00, and $10,487.79 in costs, plus reasonable attorneys' fees incurred in continuing to litigate this application.  (*See* Exhibits 1 and 2.)

94.     I swear under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        March 17, 2017

                                        ___s/ Brett H. Klein_____
                                        BRETT H. KLEIN